UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

DORIS COX, [1]            )
                          )
Plaintiff,                )
                          )
v.                        )
                          )   Case No. 2:18-CV-00055-SPM
                          )
                          )
                          )
ANDREW M. SAUL, [2]       )
Commissioner of Social Security,   )
                          )
Defendant.                )

**MEMORANDUM OPINION**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final

decision of Defendant Andrew M. Saul, Commissioner of Social Security (the "Commissioner")

denying the application of Charles E. Bradley ("Bradley") for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.*

(the "Act").

The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to

28 U.S.C. § 636(c). (Doc. 8). Because I find the decision denying benefits was supported by

substantial evidence, I will affirm the Commissioner's denial of Bradley's application.

---

[1] This action was originally filed by Charles E. Bradley, the Social Security claimant. After
Bradley's death in October 2018, Doris Cox, executor of Bradley's estate, was substituted as the
plaintiff in this case. (Doc. 21).

[2] On June 4, 2019, Andrew M. Saul became the Commissioner of Social Security. Pursuant to
Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill
as defendant in this action. No further action needs to be taken to continue this suit by reason of
the last sentence of 42 U.S.C. § 405(g).

## I.     PROCEDURAL BACKGROUND

In January 2015, Bradley applied for DIB and SSI, alleging that he had been unable to work since December 15, 2015. (Tr. 420-21, 425-30). His applications were initially denied. (Tr. 186-90). On June 4, 2015, Bradley filed a Request for Hearing by Administrative Law Judge ("ALJ") (Tr. 195-96). On September 26, 2017, following a hearing, the ALJ found that Bradley was not under a "disability" as defined in the Act. (Tr. 16-31). On November 17, 2017, Bradley filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council. (Tr. 416-19), On May 13, 2018, the Appeals Council denied Bradley's request for review. (Tr. 1-6). The decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.     FACTUAL BACKGROUND

At the hearing on November 8, 2016, Bradley testified as follows. He lived with his fiancée and their six-year-old son. (Tr. 58). He did not have a driver's license, because it was suspended for reasons unrelated to his impairments; if he had a current driver's license, he would not have any problems driving. (Tr. 58). Bradley worked most recently in July 2016 at Fifth Gear, doing a part-time job that involved lots of walking; he resigned from that job. (Tr. 59). He has also worked at Taco Bell for a week in 2014 as a cleaning captain (which involved standing and walking), but he left because he moved. (Tr. 60, 63). He worked at Sonic for a month in 2014, in a job that involved standing and cooking, but he was let go when he was in the hospital and unable to call them. (Tr. 60, 62-63). Bradley also worked in 2014 at a job during the holiday season, but he only made it two weeks because it involved ten-hour days, overnight work, and lots of walking. (Tr. 61).

Bradley testified that he had lower back pain, neuropathy, and restless leg syndrome that affected his ability to walk. (Tr. 62). Additionally, Bradley had lower back pain and tail bone problems that affected his ability to sit. (Tr. 61). Dr. Miller treated him for his conditions, and Bradley took medications but did not have surgery. (Tr. 61-62). Bradley testified that he could sit for between one-and-a-half and two hours before having to stand. (Tr. 62). He could do that about three times in an eight-hour workday. (Tr. 66). He could stand for about one-and-a-half to two hours at a time, and he could do that about three times in an eight-hour work day. (Tr. 67). He could walk for thirty minutes to an hour before having to stop to stand or sit. (Tr. 62). He had difficulty lifting, because it involves bending over, which hurt his lower back and legs. (Tr. 63). Bradley had numbness and tingling in his feet that was pretty much constant and affected his ability to walk. (Tr. 68). Although he could walk for an hour, it would hurt him to do that. (Tr. 69). He could walk about two to three blocks without pain. (Tr. 69). Bradley also had problems with balance because of his feet; that affected him about four to six times a week and sometimes made him stumble or fall. (Tr. 69-70). He testified that his restless leg syndrome caused his legs to constantly move while he tried to sleep and in the evenings. (Tr. 71). It woke him up at night. (Tr. 72).

Bradley saw Dr. Kinsella three times for neuropathy in his legs. (Tr. 63). Dr. Kinsella told him that his leg problems were related to severe nerve damage caused by his diabetes. (Tr. 64). Dr. Kinsella recommended Lyrica, which helped, but which had the side effect of making him feel "unbalanced," both mentally and physically. (Tr. 64-65). His doctor did not recommend he use a cane or that he take a different medication instead. (Tr. 65).

Bradley also had neuropathy in his hands, though it was not as bad as in his legs. (Tr. 67). His hands got numb and tingly at least three times every two weeks, from his fingertips to mid-

arm. (Tr. 67). It lasted for thirty minutes to two hours; when it happened, he had problems using his hands, writing, and carrying things without dropping them; it also caused pain. (Tr. 68).

Bradley testified that he also had myopathy, which caused pain that went from his back into his legs. (Tr. 70). That happened every day. (Tr. 70). He took hydrocodone for the pain. (Tr. 71). Bradley testified that he had to lie down for thirty minutes or more every day due to his back or leg pain. (Tr. 75). He used heating pads on his lower back about three to five times weekly, for thirty minutes to an hour. (Tr. 76).

Bradley was an insulin-dependent diabetic and had been so since he was fourteen years old. (Tr. 67). He checked his blood sugars three to four times daily, and they were usually in the 200s. (Tr. 72). About three to five times a week, Bradley had blood sugars so high that he had symptoms. (Tr. 72-73). When that occurred, he had constant leg pain, lack of appetite, dizziness, and confusion. (Tr. 73). He had to take his insulin, lie down or sit down, and wait it out. (Tr. 73). About three times a week, he had to lie down because of high blood sugar, and he usually fell asleep for an hour to three hours. (Tr. 73). That had been occurring for about two years prior to the hearing. (Tr. 74). Additionally, about two to four times a month, his blood sugar level dropped so low that he had symptoms. (Tr. 74). When that happened, he had to eat some sugar, sit down, and wait about fifteen minutes so that his blood sugar got high enough for him to function. (Tr. 74). During that fifteen minutes, he would be confused, angry, and unable to stand. (Tr. 74). Bradley testified that he was compliant with his diabetic diet and took his insulin and other medications as they were prescribed. (Tr. 74). Bradley drank alcohol about three days a week. (Tr. 82). A couple of doctors have advised him not to drink, but others have not said anything about it. (Tr. 82).

Bradley saw a psychiatrist, Dr. Prough, once every four months, as well as a counselor once a week over the phone. (Tr. 77). He had depression and anxiety that caused crying spells and thinking too deeply about things. (Tr. 77). He had panic attacks two to six times a month. (Tr. 77).

On July 18, 2017, the ALJ held a supplemental hearing. (Tr. 96). Bradley testified that in March 2017, his blood sugar dropped to 22, then raised instantly up over the 500s, and he was admitted to the hospital. (Tr. 103). Additionally, in December 2016, he was hospitalized after a motor vehicle accident caused by a low blood sugar episode. (Tr. 105). Bradley testified that around that time he was drinking about a pint of vodka a night, but that he does not drink that much anymore. (Tr. 105).

With regard to the medical treatment records, the Court accepts the facts as presented in the parties' respective statements of fact. Briefly, the record shows that Bradley had insulin-dependent diabetes that was sometimes well controlled but often uncontrolled or poorly controlled; that he had several emergency room visits associated with episodes of very high or very low blood sugar, that he sometimes complained of lower back pain that radiated to his legs; that he had restless leg syndrome; and that he had severe diabetic polyneuropathy that caused pain, decreased sensation, and numbness in his feet and legs; and that he had depression and anxiety.

## III.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§

423(d)(1)(A); 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e), 416.945(a)(1). At Step Four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c)(2), 416.920(a)(4)(v), 416.920(g), 416.960(c)(2); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).

## IV.   THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Bradley had not engaged in substantial gainful activity since December 15, 2013, the alleged onset date; that Bradley had the severe impairment of diabetes mellitus with polyneuropathy; and that Bradley did not have an impairment or combination of impairments that meets or medically equals the severity

of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 19-22). The ALJ found that Bradley had the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can stand or walk for 15 minutes at a time. He can perform occasional bilateral reaching. He can perform no operation of foot controls with either bilateral extremity. He can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs. He can occasionally balance, stoop, knees, crouch, or crawl. The claimant should never be exposed to unprotected heights, dangerous moving machinery, or operating a motor vehicle as a job duty. The claimant should have no more than frequent exposure to the following: humidity, wetness, dust, fumes, odors, pulmonary irritants, extreme cold, extreme heat, or vibration. He cannot walk a block at a reasonable pace on rough or uneven surfaces.

(Tr. 23). At Step Four, the ALJ found that Bradley was unable to perform any past relevant work. (Tr. 29). However, at Step Five, relying on the testimony of a vocational expert, the ALJ found that there were other jobs existing in the national economy Bradley could perform, including call out operator, surveillance system monitor, and bonder semi-conductor. (Tr. 30).

## V.   DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds: (1) the ALJ erred in failing to give more weight to the opinion of Bradley's treating doctor, Dr. Aaron Miller, and (2) the RFC finding of sedentary work is not supported by substantial evidence and is not consistent with the medical evidence.

### A.  Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate

to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's Evaluation of the Opinion of Treating Physician Dr. Miller

Plaintiff's first argument is that the ALJ gave insufficient weight to the opinion of his treating physician, Dr. Miller. (Tr. 829-32). In a Medical Source Statement dated August 12, 2016, Dr. Miller opined that Bradley could lift and carry up to ten pounds frequently and twenty pounds occasionally; could stand and walk (with normal breaks) for less than two hours a day; could sit (with normal breaks) for about two hours a day; could sit for 10 minutes at a time before changing position; could stand for 10 minutes at a time before changing position; must walk around for about ten minutes about eight times in an eight-hour day; needed to be able to shift at will from sitting or standing/walking; and would need to lie down about twice during an eight-hour shift. (Tr. 829). Asked what findings supported these limitations, he wrote, "per neurology evaluation/examination he was diagnosed with severe diabetic polyneuropathy and possible pravastatin-induced myopathy—started on meds and was followed without significant

9

improvement." (Tr. 829). Dr. Miller also opined that Bradley could occasionally bend and crouch; never climb stairs or ladders; frequently finger and feel; and occasionally reach, handle, and push/pull, based on Dr. Kinsella's complete neurologic examination. (Tr. 830). He also opined that Bradley must avoid moderate exposure to chemicals and concentrated exposure to extreme cold, extreme heat, high humidity, fumes and odors, soldering fluxes, and solvents and cleaners. (Tr. 831). He opined that Bradley would be absent from work due to his impairments or treatment more than four days per month and would be off-task 25% of the time or more. (Tr. 831-32). He also opined that due to muscle weakness and pain/paresthesias and numbness, Bradley would need to take unscheduled breaks about five to ten times during the workday, with each break lasting ten minutes. (Tr. 832).

In August 2017, Dr. Miller was asked to state whether alcohol and/or substance abuse contributed to any of the limitations in his earlier opinion, and if so what changes he would make to his earlier opinion if Bradley was totally abstinent from alcohol and substance use. He stated, "occasional use of alcohol would not change my recommendations." (Tr. 1198). He then re-signed his prior Medical Source Statement. (Tr. 1203).

Under the regulations applicable to Bradley's claim, if the Social Security Administration finds that a treating source's medical opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," the Social Security Administration will give that opinion "controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[3] Where the ALJ does not give a treating physician's opinion

---

[3] These regulations apply to claims filed before March 27, 2017. For claims filed after March 27, 2017, the rule that a treating source opinion is entitled to controlling weight has been eliminated. *See* 20 C.F.R. §§ 404.1520c(a), 416.920(a). Bradley filed his application in 2015, so

controlling weight, the ALJ must evaluate the opinion based on several factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the evidence provided by the source in support of the opinion, the consistency of the opinion with the record as a whole, and the level of specialization of the source. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2). The ALJ may discount a treating physician's opinion where, for example, "other medical assessments are supported by better or more thorough medical evidence," *Goff*, 421 F.3d at 790 (internal quotation marks omitted), or the opinion "is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). "When an ALJ discounts a treating physician's opinion, [the ALJ] should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (internal quotation marks omitted).

The ALJ discussed Dr. Miller's opinion but gave it "less weight" than he gave the opinion of the medical expert, Dr. Goldstein. The ALJ stated:

> Overall, [the limitations in Dr. Miller's opinion] are rather extreme and not supported by Dr. Miller's treatment records. For instance, he indicated these restrictions would apply back to the claimant's alleged onset date of December 2013, yet he only began treating the clamant in March 2016. Further, there are no clinical findings documented by Dr. Miller that are consistent with absenteeism or off-task behavior, such as missing appointments or being distracted upon examination. In addition, the claimant acknowledged in his testimony that he could sit or stand for 90 to 120 minutes and could walk for 30 to 60 minutes at a time, which does not support Dr. Miller's assessment of only up to two hours sitting per day or less than two total hours of standing or walking. Dr. Miller bases his assessment upon the "severe diabetic polyneuropathy" and "possible pravastatin induced myopathy" and neurological examination conducted by Dr. Kinsella, and did not indicate that they were based on his own observations or findings. Dr. Kinsella's later treatment of the claimant indicates that myopathy was not suspected after all. (Ex. B11F). Further Dr. Miller made only rare documentation of examinations of the claimant's lower extremities, but when he did, the claimant had no diabetic ulcerations, normal nails, and normal pedal pulses. (Ex. B21F; B22F).

the Court will apply the version of the regulations that applies to claims filed before March 27, 2017.

11

He made no documentation of sensory findings, and the claimant denied paresthesias (Ex. B19F/2, B22F/8). In hospital examinations, the claimant's motor and sensory function was intact. (Ex. B1F; B18F; B25F). Accordingly, Dr. Miller's opinion can be given less weight than that of Dr. Goldstein.

Dr. Miller reiterated his opinion of the claimant's functional abilities by re-signing his original assessments in August 2017 (Ex. B28F). He further opined occasional alcohol use would not affect his opinion of the claimant's limitations. The record shows that the claimant has engaged in more than occasional alcohol use. For example, although he had cut down on drinking, the claimant testified he had been drinking one pint of vodka 4-5 nights a week. He has reported elsewhere that he drinks regularly. (Ex. B15F). As noted above, I give less weight to the opinion of Dr. Miller.

(Tr. 27-28).

After careful review of the record, the Court finds that the ALJ gave good reasons, supported by substantial evidence, for partially discounting Dr. Miller's opinion, and that the assessment of that opinion falls within the available zone of choice.

The Court first notes that although the ALJ gave "less weight" to Dr. Miller's opinion than to the opinion of the medical expert, she did not disregard Dr. Miller's opinion entirely. The ALJ limited Bradley to sedentary work, which involves lifting and carrying no more than ten pounds at a time and is thus more restrictive than the lifting and carrying limitations in Dr. Miller's opinion. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a). Although the ALJ did not fully credit Dr. Miller's opinion that Bradley could only stand or walk for ten minutes at a time, the ALJ imposed significant standing and walking limits, finding that Bradley could stand and walk no more than fifteen minutes at a time. The ALJ also adopted Dr. Miller's opinion that Bradley could only occasionally stoop and crouch, could never climb ladders, and could only perform occasional bilateral reaching.

The ALJ did discount some of Dr. Miller's opinions, including the opinions that Bradley could only sit for a total of two hours in an eight hour day; would need to walk around for ten

minutes eight times a day; would need to lie down at unpredictable intervals; could never climb ladders, could only occasionally handle and push/pull; could only frequently finger and feel; would be absent from work more than four days per month, would be off-task 25% or more of the work day; and would require unscheduled ten-minute breaks five to ten times a day during the workday due to muscle weakness, pain/paresthesias, and numbness. To the extent that the ALJ did not accept all of the limitations in Dr. Miller's opinion, she gave good reasons for that decision.

First, the ALJ reasonably found that Dr. Miller's own treatment records did not provide support for the fairly extreme findings in his opinions. As the ALJ noted, Dr. Miller's treatment notes did not contain any clinical findings to support the limitations in handling, fingering, and feeling, such as findings of decreased sensation or strength of the hands or upper extremities. (Tr. 27). To the contrary, when Dr. Miller performed an examination of Bradley's upper extremities, his findings were normal, with normal range of motion, no tenderness to palpation, no joint crepitus, and no pain with motion. (Tr. 867). The ALJ also reasonably noted that there were no clinical findings in Dr. Miller's treatment notes to support his opinions regarding absenteeism or being off-task, such as missing appointments or being distracted on examination. (Tr. 27). The ALJ also reasonably considered that Dr. Miller made only rare documentation of examinations of the claimant's lower extremities, and that when he did, those examinations were almost entirely normal, with findings of no tenderness to palpation; normal range of motion; no pain on range of motion; normal hip, knee, and ankle stability; and no rashes, lesions, or diabetic ulcers (Tr. 28, 849, 867, 1091, 1110, 1119, 1121, 1141-42). The ALJ also reasonably noted that although Dr. Miller's opinions were based in part on Bradley's pain/paresthesias and numbness, the ALJ made no documentation of sensory findings, and Bradley denied paresthesias. (Tr. 28, 1068, 1140). The Court further notes that Dr. Miller did not note consistent complaints of back or leg pain that might

justify the need to lie down at unpredictable intervals or the extreme limitations in sitting, standing, and remaining on-task in his opinion. Although Bradley complained to Dr. Miller of pain in his back and/or leg at several visits during Dr. Miller's treatment period (March 2016 through May 2017) (Tr. 847, 851, 865, 1089, 1120, 1123, 1140), Bradley denied being in any pain during visits in May 2016, June 2016, November 2016, December 2016, and January 2017 (Tr. 837, 844, 1073, 1112, 1117), and he did not mention leg or back pain at visits in July 2016 and March 2017 (Tr. 834, 1076). Additionally, when Dr. Miller performed spinal examinations, they were generally normal (aside from one finding of mild lumbar spinal tenderness), showing normal range of motion, no subluxations, normal paraspinal muscle strength and tone, and normal gait. (Tr. 849, 867, 1091). "[A]n ALJ may discount a treating source opinion that is unsupported by treatment notes." *Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016). *Cf.* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

Second, the ALJ reasonably considered that Dr. Miller based his opinions on Dr. Kinsella's neurological examination and findings of "severe diabetic polyneuropathy" and "possible pravastatin induced myopathy," rather than on his own observations or findings. (Tr. 28). Plaintiff argues that the ALJ's suggestion that Dr. Miller did not rely on his own observations is incorrect, because the boilerplate language on the Medical Source Statement Form states, "The opinion should be based on your findings with respect to medical history, clinical and laboratory findings, diagnosis, prescribed treatment and response, and prognosis." (Tr. 829). However, when specifically asked what medical findings supported the limitations in the opinion, Dr. Miller referenced only Dr. Kinsella's examinations and findings. (Tr. 829-30). It was not unreasonable

for the ALJ to conclude that Dr. Miller's assessment was based primarily on Dr. Kinsella's findings rather than his own, particularly in light of the above-descried absence of specific clinical findings in Dr. Miller's own treatment notes. Moreover, although Dr. Kinsella's notes certainly contain support some of the limitations in Dr. Miller's opinions, they do not contain support for all of those opinions. Dr. Kinsella's notes show that Bradley had significant pain and loss of sensation in his legs and feet associated with severe polyneuropathy, which supports Dr. Miller's opinion that Bradley would have significant standing and walking limitations. (Tr. 874-75, 876-77, 878-90) However, Dr. Kinsella's notes do not contain any findings or observations that would support the limitations on the use of upper extremities found in Dr. Miller's opinions, nor do they contain findings that appear to support Dr. Miller's opinions regarding Bradley's difficulty sitting, his need for frequent breaks, or his need to lie down during the day. (Tr. 874-75, 876-77, 878-90).

Third, the ALJ reasonably considered the fact that although Dr. Miller stated that Bradley's disability began in December 2013, Dr. Miller did not actually begin seeing Bradley until March 2016. (Tr. 27, 851-54). Although, as Plaintiff points out, Dr. Miller presumably had access to the earlier notes from Bradley's nurse practitioner and other treatment notes, the fact that Dr. Miller was not actually treating or examining Bradley during much of the relevant period was a reasonable factor to consider. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (the "length of the treatment relationship" is one factor to be considered in evaluating a treating source's opinion).

Fourth, the ALJ reasonably considered that treatment notes other than those from Dr. Miller were to some extent inconsistent with his opinions. For example, the ALJ reasonably noted that in hospital examinations, Bradley's treatment providers found his motor and sensory function was normal. (Tr.28, 609-10, 630, 642, 1011, 1044-45, 1177).

Fifth, the ALJ discussed in her decision the fact that Bradley's own testimony indicated that he had fewer limitations than were contained in Dr. Miller's opinion. (Tr. 26). Although Dr. Miller opined that Bradley could sit for only ten minutes without having to stand, and could only sit for about two hours total in an eight-hour day, Bradley himself testified that he could sit for one-and-a-half to two hours before having to stand, and that he could do that about three times in an eight-hour workday. (Tr. 62, 66). Similarly, contrary to Dr. Miller's opinion that Bradley could only stand for ten minutes before changing position and could only stand and walk for less than two hours total in an eight-hour workday, Bradley testified that he could stand for one-and-a-half to two hours a time, about three times in an eight-hour workday (Tr. 67), and could walk for thirty minutes to an hour before having to stop to stand or sit. (Tr. 62). *See Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) (finding that the plaintiff's "self-reported activities of daily living provided additional reasons for the ALJ to discredit [the treating doctor's] pessimistic views of her abilities"); *Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014) (finding the ALJ reasonably stated he discounted physician's opinion because the opinion was "more restrictive than self-reported activities").

Sixth, the ALJ also properly considered other opinion evidence that was not consistent with Dr. Miller's opinion. (Tr. 27). The ALJ gave great weight to the opinion of non-examining medical expert Steven Goldstein, M.D., who opined, *inter alia*, that Bradley could lift and carry up to ten pounds frequently but could never lift or carry more; could sit for four hours at a time and for six hours total in an eight-hour workday; could stand for fifteen minutes at a time and for two hours total in an eight-hour workday; could walk for fifteen minutes at a time and two hours in an eight-hour workday; could occasionally reach in all directions; could frequently finger, handle, feel, and push/pull; could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl;

could never operate foot controls or climb ladders or scaffolds; could never be around unprotected heights or moving mechanical machinery; and could never operate a motor vehicle. (Tr. 899-909). The ALJ reasonably found Dr. Goldstein's opinions were consistent with the record as a whole, including Bradley's testimony, his history of diabetic polyneuropathy and the physical findings in the record. (Tr. 27). *See Goff*, 421 F.3d at 790 (noting that the ALJ may discount the opinion of a treating physician "where other medical assessments are supported by better or more thorough medical evidence").

In sum, the Court finds that the ALJ gave good reasons, supported by substantial evidence, for discounting the opinion of Dr. Miller. The ALJ cited 20 C.F.R. §§ 404.1527 and 416.927(c), and he discussed several of the relevant factors in his decision, including the consistency of Dr. Miller's opinion with his own treatment notes other evidence. (Tr. 23-29). The ALJ also "explained his rationale in a manner that allows the [Court] to follow [her] line of reasoning" *Nishke v. Astrue*, 878 F. Supp. 2d 958, 984 (E.D. Mo. 2012).

The Court acknowledges that the record contains conflicting evidence regarding the effects of Bradley's impairments, and the ALJ certainly could have reached a different conclusion with regard to the appropriate weight to give to Dr. Miller's opinions and Dr. Goldstein's opinions. However, it is the role of the ALJ to resolve conflicting medical opinion evidence. *See Renstrom*, 680 F.3d at 1065. It is not the role of this Court to reweigh the evidence presented to the ALJ. The ALJ's weighing of the evidence here fell within the available "zone of choice," and the Court cannot disturb that decision merely because it might have reached a different conclusion. *See Hacker v. Barnhart*, 459 F.3d 934, 936-38 (8th Cir. 2006).

## C. The RFC Assessment

Plaintiff's second argument is that the RFC, which limits Plaintiff to sedentary work with some additional limitations, is not supported by substantial evidence and is not consistent with the medical evidence. Plaintiff makes several specific challenges to the RFC finding, which the Court will address below.

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008)).

Plaintiff first argues that the ALJ did not adequately address Bradley's credible symptoms or the side effects of his necessary medications in determining the RFC. Plaintiff does not, however, specify what symptoms or side effects the ALJ failed to consider. To the extent that Plaintiff is attempting to challenge the ALJ's analysis of Plaintiff's subjective symptoms, that attempt fails. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Social Security Ruling ("SSR") 16-

3p, 2017 WL 5180304, at *4 (Oct. 25, 2017).[4] In examining the record, the Commissioner must consider several factors, including the claimant's daily activities; the duration, intensity, and frequency of the symptoms; the precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; any functional restrictions; the claimant's work history; and the objective medical evidence. *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008), and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). *See also* SSR 16-3p, 2017 WL 5180304, at *7-*8 (describing several of the above factors, as well as evidence of treatment other than medication that an individual receives); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (same).

Here, the ALJ conducted a proper assessment of Bradley's symptoms, consistent with the relevant regulations and with SSR 16-3p, and that assessment is supported by substantial evidence. First, the ALJ reasonably considered that Bradley's daily activities, which included performing personal care activities with no problems, doing household chores, shopping for one to two hours a time, walking for up to half a mile before needing to rest, and taking care of his young autistic son, were inconsistent with the suggestion that he could not perform a limited range of sedentary work. (Tr. 26, 494-98). *See Vance v. Berryhill*, 860 F.3d 1114, 1121 (8th Cir. 2017) (finding "[t]he inconsistency between [the claimant's] subjective complaints and evidence regarding her activities of daily living" raised questions about the weight to give to her subjective complaints); *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (finding that in assessing a claimant's credibility,

---

[4] This analysis was previously described as an analysis of the "credibility" of a claimant's subjective complaints. However, the Commissioner has issued a new ruling, applicable to decisions made on or after March 28, 2016, that eliminates the use of the term "credibility" when evaluating subjective symptoms. SSR 16-3p, 2017 WL 5180304, at *1-*2 (Oct. 25, 2017). This clarifies that "subjective symptom evaluation is not an examination of an individual's character." *Id.* at *2. The factors to be considered remain the same under the new ruling. *See id.* at *13 n.27 ("Our regulations on evaluating symptoms are unchanged."). *See also* 20 C.F.R. § 404.1529.

the ALJ properly considered the fact that the claimant took care of her eleven-year-old child, drove her to school and did other driving, fixed simple meals, did housework, shopped for groceries, and had no difficulty handling money).

Second, the ALJ reasonably considered the absence of objective examination findings to support Bradley's complaints, reasonably noting that although Bradley certainly had findings showing neuropathy in his lower extremities, examination findings were otherwise largely normal, with findings of normal gait, normal range of motion and no tenderness in the upper extremities, normal range of motion and no tenderness in the lower extremities, and normal range of motion and normal muscle strength and tone in the spine (Tr. 26, 609-10, 630, 642, 849, 867, 1011, 1044-45, 1091, 1177). It was proper for the ALJ to consider the absence of objective findings to support all of Bradley's subjective symptoms in assessing those symptoms. *See Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010) ("Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence."); *Goff v. Barnhart*, 421 F.3d at 792 (holding that it was proper for the ALJ to consider unremarkable or mild objective medical findings as one factor in assessing subjective complaints).

Third, the ALJ also reasonably considered evidence that Bradley's blood sugar levels did "appear to respond to proper monitoring, medication, and carbohydrate counting" and that Bradley's episodes of high or low blood sugar were sometimes associated with failure to comply with recommendations related to his diabetes control. (Tr. 26). For example, after a low blood sugar incident led Bradley to be injured in a car accident, the treating provider noted that Bradley was "taking a fixed dose of novolog insulin not taking into account his carb intake, which will definitely cause very erratic sugars"; it was also noted that Bradley had "limited adherence to

nutrition related recommendations." (Tr. 928, 933, 937). Additionally, on several occasions, Dr. Miller's notes indicate that Bradley's blood sugars were better controlled when he was counting carbohydrates, checking his blood sugars regularly, and/or making appropriate dietary choices, and worse when he was not compliant. (Tr. 837, 844-46, 849, 1073, 1089, 1143). Although the records did not suggest that Bradley's blood sugar levels could be completely controlled, it was not improper for the ALJ to consider both the improvement with treatment and the failure to consistently follow treatment recommendations as factors in partially discounting Bradley's complaints. *See Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016) (ALJ properly considered the plaintiff's "resistance to some suggested courses of treatment" in assessing her subjective symptoms); *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility."); *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (internal quotations and citation omitted).

Fourth, the ALJ considered Bradley's ability to work at jobs involving a great deal of walking even after the alleged disability onset date, albeit only for brief periods. (Tr. 26). Although Plaintiff testified that he could not keep up with these jobs because they involved too much walking, the ALJ reasonably considered that Plaintiff's testimony about those jobs was inconsistent with his suggestion that he could not perform even sedentary jobs that were far less demanding. *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) ("It was also not unreasonable for the ALJ to note that [the plaintiff's] daily activities, including part-time work . . . were inconsistent with her claim of disabling pain."). *See also* 20 C.F.R. §§ 404.1571, 416.971 ("The work, without regard to legality, that [a claimant] ha[s] done during any period in which [the claimant] believe[s] [he or she is] disabled may show that [the claimant is] able to work

at the substantial gainful activity level . . . Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.").

In sum, the Court finds that the ALJ conducted a proper evaluation of Bradley's claimed symptoms, considered several of the relevant factors, and gave good reasons for finding those symptoms not entirely consistent with the record. The Court must defer to the ALJ's evaluation of Bradley's subjective symptoms. *See Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) (citing *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008)).

Plaintiff's second argument is that the ALJ should not have given great weight to the opinion of medical expert Dr. Steven Goldstein. With regard to Dr. Goldstein, the ALJ stated:

> As for the opinion evidence, I have given great weight to the opinion statement and testimony of the impartial medical expert, Steven Goldstein, M.D. (Ex. B14F; Witness Testimony). Dr Goldstein opined the claimant capable of a range of sedentary exertional work with sitting up to four hours per day, and standing or walking up to two hours each in 15-minute increments, occasional reaching, no use of foot controls, occasional postural activities except for climbing ladders ropes or scaffolds, elimination from hazards, and reduction in exposure to other environmental factors. He further opined that the claimant was unable to walk a block at reasonable pace on uneven terrain. At the supplemental hearing, Dr. Goldstein testified that with the additional evidence reviewed, his opinion was unchanged. Overall, this assessment appears consistent with the record as a whole. The claimant's neuropathy reasonably causes numbness that would preclude him from uneven terrain. Given his blood sugar highs and lows, he should never work around hazards or upon ladders, ropes, or scaffolds. The claimant testified to occasional neuropathic symptoms of his upper extremities, but those were not persistent, nor have there been significant correlating objective signs supporting further limitation. The claimant acknowledged an ability to stand or walk for up to 90 minutes at a time, three times per day, although this may reasonably exacerbate his symptoms. At the second supplemental hearing, when Dr. Goldstein was not available for further questioning, the representative contended that the medical expert's opinion was based on any patient with the claimant's impairments, given his prior testimony at the first supplemental hearing describing typical symptoms experienced at various blood glucose ranges. However, Dr. Goldstein testified that he based his assessments of the claimant's limitations based upon the claimant's documented symptoms and impairments, not on the "average" patient with diabetes. Although Dr. Goldstein did not examine the claimant, his assessments are overall consistent with the record as a whole, given the claimant's testimony, his history of diabetic polyneuropathy, and the lack of consistent documentation of

physical findings that would support preclusion from the range of abilities assessed by Dr. Goldstein.

(Tr. 27).

Plaintiff suggests that the ALJ should have given less weight to the opinion of Dr. Goldstein because Dr. Goldstein did not know that Bradley was a Type I diabetic rather than a Type II diabetic. As Plaintiff points out, Dr. Goldstein's testimony at the hearing suggests that he may have been unaware that Bradley was a Type I diabetic. He acknowledged the episodes of very high and low blood sugar in the record and testified that he could not tell from the record why they were occurring. (Tr. 128-29). He also testified that although some Type I diabetics are characterized as "brittle diabetics" who are very sensitive to small changes in insulin, in a Type II diabetic it is unusual not to find a reason for wide swings in blood sugar. (Tr. 129-30). After being informed that Bradley was a Type I diabetic, he testified that might (or might not) be a reason for Bradley's swings in blood sugar. (Tr. 130). The Court does not find that these facts significantly undermine the ALJ's decision to give great weight to Dr. Goldstein's opinion. Even if Dr. Goldstein was unsure about why Bradley's high and low blood sugar episodes were occurring, he acknowledged in his testimony that they were occurring, and his opinions accounted for the fact that they were occurring. (Tr. 128-33). There is nothing to suggest that Dr. Goldstein doubted that Bradley experienced significant episodes of high and low blood sugar or that his assessment of the reasons for those episodes affected his opinions regarding Plaintiff's ability to function. Dr. Goldstein explained at the hearing that the limitation to sedentary work was based on Bradley's frequently elevated blood sugar levels, which may cause fatigue. (Tr. 116-17, 133). He also accounted for Bradley's occasional very high and very low blood sugar episodes (which might cause passing out or other serious symptoms) by finding that he could never climb ladders or

scaffolds, could never be around unprotected heights, could never be around unprotected heights, and could never operate a motor vehicle. (Tr. 904).

The Court finds no error in the ALJ's assessment of Dr. Goldstein's opinions. The ALJ reasonably found that Dr. Goldstein's opinions were generally consistent with the record as a whole, including the objective medical evidence and Bradley's own testimony, and he reasonably gave them great weight.

Plaintiff also argues that Dr. Goldstein's opinion does not constitute substantial evidence to support the RFC finding, because he is a non-treating/non-examining doctor. The Court acknowledges that the opinion of a non-examining physician, standing alone, does not constitute substantial evidence. *See, e.g.*, *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004). However, an ALJ may properly rely on such opinions as one part of the record where the record as a whole provides support for the ALJ's findings. *Id.* Here, the ALJ did not rely solely on the opinion of Dr. Goldstein in making the RFC finding. He also relied on the opinion of Dr. Miller, the objective evidence in the record, the treatment notes from Bradley's various treating physicians and nurse practitioner, and Bradley's own testimony.

Plaintiff next suggests that there is an error in the RFC, because the ALJ states that "Dr. Goldstein opined the claimant capable of . . . sitting up to four hours per day and stand or walk up to two hours in 15-minute increments," (Tr. 27), and that adds up only to a six-hour day, not an eight-hour day. The Court finds no error that requires reversal. A review of Dr. Goldstein's opinion shows that Dr. Goldstein actually opined that Bradley could sit for *six* hours total in an eight-hour workday. (Tr. 901). The ALJ's mischaracterization of his opinion was no more than a typographical error that did not affect the outcome of the case, and it does not require remand. *See Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency

in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case.").

Plaintiff also argues that the ALJ should have included in the RFC the limitations in Dr. Miller's opinion indicating that Bradley would be absent from work due to his impairments or treatment more than four days per month and would be off-task 25% of the time or more, which would make Bradley unemployable.[5] Plaintiff argues that these limitations are supported by the nine emergency room visits over three and a half years and the findings of high and low blood sugar episodes. The Court acknowledges that the ALJ might reasonably have found those limitations credible and included them in the RFC. However, the evidence of emergency room visits and high or low blood sugar episodes does not necessarily translate to a certain number of absences per year or a certain percentage of time being off-task. The ALJ reasonably weighed this evidence along with the rest of the evidence (including the absence of evidence that Bradley missed appointments or was distracted on examination) in coming to her conclusion with regard to these claimed limitations, and it is not the role of the Court to reweigh the evidence.

Plaintiff's next argument is that the ALJ erred by giving weight to the notation of Bradley's nurse practitioner, Beth Brothers, that she did not feel Bradley was disabled. (Tr. 28). On March 27, 2014, Ms. Brothers noted that she had she returned a disability form to Bradley's attorneys, stating, "do not feel pt is disabled." (Tr. 681). The ALJ noted that although this was not a specific functional analysis of Bradley's abilities, it was "nonetheless supportive of the conclusion of this case." (Tr. 28). The Court finds no error that would require remand. A medical treatment provider's opinion regarding whether a patient is "disabled" involves an issue reserved for the Commissioner,

---

[5] The vocational expert testified that an individual can be absent from work between three and five days a year and still be employable, and can be off-task 10 to 12% of the time and still be employable. (Tr. 91-92).

and it is not entitled to weight as a medical opinion. *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). However, the ALJ did not rely solely or primarily on Ms. Brother's opinion, but rather considered it along with the large amount of other opinion evidence and other evidence in this case.

Finally, Plaintiff appears to suggest that the ALJ impermissibly made her own medical findings and drew her own inferences from medical reports rather than relying on medical opinion evidence. The Court disagrees. It is well-established that the ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians" in determining a claimant's RFC. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quotation marks omitted)); *Martinez v. Colvin*, No. 12–3042–CV–S–ODS–SSA, 2013 WL 1945703, at *5 (W.D. Mo. May 10, 2013 (rejecting the plaintiff's argument that because the ALJ gave little weight to the opinions of the plaintiff's physicians, the RFC assessment was necessarily the product of unsupported speculation). Instead, "[i]t is the ALJ's responsibility to determine [claimant's] RFC based on all the relevant evidence." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted). Here, although the RFC did not mirror any of the particular opinions in the record, the record contained opinion evidence regarding Bradley's ability to function from multiple sources, including Bradley's treating physician. The ALJ properly determined Bradley's RFC based on all of the evidence in the record, including opinion evidence.

In sum, although this case involved conflicting medical and non-medical evidence, some of which would have supported an RFC more restrictive than the one found by the ALJ, the Court finds that the RFC assessment was supported by substantial evidence. It is the ALJ's duty to resolve conflicts in the evidence, including medical evidence, and this Court may not substitute its opinion for the ALJ's. The ALJ's weighing of the medical opinion and other evidence here fell

within the available zone of choice, and the Court cannot disturb that decision merely because it might have reached a different conclusion.

**VI.    CONCLUSION**

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.


_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of September, 2019.